## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**UNITED STATES OF AMERICA**

**V.**                                              **C.R. NO. 03-10361-RWZ**

**JOHN MELO**

## MEMORANDUM IN SUPPORT OF DEFENDANT, JOHN MELO'S, OBJECTION TO THE GOVERNMENT'S SENTENCING ENHANCEMENT PURSUANT TO 21 U.S.C. §851

Now comes the defendant, John Melo, by and through counsel, and hereby respectfully submits this memorandum of law in support of his objection to the sentencing enhancement sought by the Government pursuant to 21 U.S.C. §851.

### FACTUAL BACKGROUND

On December 3, 2003, Mr. Melo was indicted by grand jury with one count of conspiracy to distribute and possession with intent to distribute over five kilograms of cocaine in violation of 18 U.S.C. 846, 841(a)(1) and 841(b)(1)(A) . On May 22, 2005, Mr. Melo entered a plea of guilty to this indictment. Sentencing is scheduled for September 14, 2005.

On April 25, 2005, the Government filed a §851 information notifying Mr. Melo that it would seek enhanced penalties set forth in 21 U.S.C. §§ 841(b)(1)(A) and 841(b)(1)(B) as a result of Mr. Melo's October 2, 1996 conviction in the Bristol County Superior Court for possession with intent to distribute a Class A substance. As a result of this sentencing enhancement, Mr. Melo is facing a mandatory minimum sentence of twenty years of imprisonment.

## ARGUMENT

### MR. MELO OBJECTS TO THE §851 INFORMATION ON THE GROUNDS THAT HIS PRIOR FELONY DRUG CONVICTION WAS OBTAINED IN VIOLATION OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

Mr. Melo objects to the filing of the §851 information pursuant to 21 U.S.C. §851(C)(1).

Specifically, Mr. Melo contends that the October 1, 1996 conviction for Possession with intent to

distribute a Class A substance (heroin)objection was obtained in violation of his Sixth

Amendment right to effective assistance of counsel.

On September 22, 2004, counsel for Mr. Melo filed a Motion for New Trial and

Supporting Memorandum of Law in New Bedford Superior Court. This motion contested the

validity of the October 1, 1996 conviction and raised the specific grounds that Mr. Melo's

counsel was not licensed to practice in the Commonweath of Massachusetts and provided

ineffective assistance throughout the course of trial. See Exhibit 1, Motion for New Trial and

Supporting Memorandum of Law. Mr. Melo incorporates all of the arguments raised in the

attached brief as grounds for the denial of the §851 sentencing enhancement.

On October 21, 2004, a Massachusetts trial judge denied Mr. Melo's motion for new trial

without a hearing and without any written response or objection from the Commonwealth. A

timely appeal was filed before the Massachusetts Appeals Court and is currently pending.

Counsel for Mr. Melo concedes that this conviction occurred more than five years prior

to the filing of the information and is therefore subject to the time limitations of 21 U.S.C.

§851(e). For purposes of preservation, however, counsel for Mr. Melo asserts the objection. In

the event that this conviction is vacated by a Massachusetts court, counsel for Mr. Melo intends

to file a habeas corpus petition pursuant to 28 U.S.C. §2255 requesting a re-sentencing hearing.

2

If there is no decision from the Massachusetts courts within one year of the final date of Mr.

Melo's federal conviction, counsel for Mr. Melo intends to file an unripe claim for habeas corpus

relief and request reconsideration when and if it becomes appropriate to do so. See McCarthy v.

United States, 135 F.Supp.2d 112 (D.Mass. 2001)(unpublished opinion)(a defendant may seek

to reopen a § 2255 proceeding and obtain a district court adjudication of a previously-raised

claim).

## **CONCLUSION**

For the foregoing reasons, Mr. Melo respectfully requests that this Honorable Court grant

his objection to the Government's filing of the §851 information.

Respectfully submitted,
John Melo
By his attorney,

John E. MacDonald, BBO# 653775
Larochelle & MacDonald, Inc.
One Turks Head Place, Suite 1440
Providence, RI 02903
(401) 421-1440
(401) 421-1442 (FAX)

## **CERTIFICATION**

I hereby certify that on $\underline{8 \cdot 3 \theta \cdot 0 \cdot 5}$ a true copy of this document was delivered to William
Weinreb, AUSA, Office of the United States Attorney for the District of Massachusetts, One
Courthouse Way, Suite 9200, Boston, Massachusetts, 02210.

3

#25



Commonwealth of Massachusetts

Bristol, ss.                                    New Bedford Superior Court
BRISTOL, SS SUP'                                No. 36946

SEP 2 2 2004                    Commonwealth

                                        v.

MARC J. SANTOS, ESQ                    John Melo
CLERK/MAGISTRATE

---

## Motion for New Trial and Supporting Memorandum of Law

John Melo, the defendant in the above-entitled matter, moves, pursuant to Mass.

R. Crim. P. 30(b), that this Court enter an order vacating his conviction and ordering a

new trial. As explained in more detail below, this motion should be granted for three

reasons: (1) because the defendant's right to counsel under the state and federal

constitutions was violated in that his trial attorney was not authorized to practice law in

Massachusetts; (2) because trial counsel provided substandard representation, thereby

denying the defendant his right to the effective assistance of counsel under both the state

and federal constitutions; and (3) because the court's jury instructions regarding

identification presumed that the defendant was the perpetrator and thereby created a

substantial risk of a miscarriage of justice.

In support of this motion, the defendant states as follows:



## I.    **Factual Background**

### A. **Defendant's trial counsel was not licensed to practice law in Massachusetts.**

On October 1, 1995, a Bristol County grand jury returned an indictment against John Melo charging him with the unlawful possession of a class A substance with intent to distribute. (See Exhibit 1, indictment). John M. Cicilline, of Providence, Rhode Island, filed a notice of appearance and represented the defendant at trial. (See Exhibit 2, notice of appearance, and Exhibit 3, docket sheets for case no. 36946). The trial transcripts show that Mr. Cicilline represented the defendant alone at trial and that there was no local counsel present at any point. Prior to trial, the only motion Mr. Cicilline filed on the defendant's behalf was a motion to continue the trial date. (See Exhibit 3). Mr. Cicilline was not authorized to practice law in the Commonwealth of Massachusetts. (See Exhibit 4, letter dated May 14, 2004, from the Massachusetts Board of Bar Overseers).

After trial, Randy Olen, also of Providence, Rhode Island, filed a Motion to Interrupt and Stay Execution of Sentence. (See Exhibit 5). Because Mr. Olen did not file an appellate brief, however, Mr. Melo's appeal was dismissed by the Appeals Court for lack of prosecution. (See Exhibit 6, notice of dismissal of appeal). Mr. Olen was also not authorized to practice law in Massachusetts. (See Exhibit 4).

2

## B. Mr. Cicilline did not object to the court's failure to excuse prospective jurors who failed to state that they could be impartial.

Between September 30 and October 1, 1996, Mr. Melo was tried before a jury in the Bristol County Superior Court. During jury selection, one prospective juror, panel 6, seat 1, explained that, because she had been married to "an ex-detective on the narcotics squad," she could not be impartial. (Tr.1/16.)[1] The court told the juror that "that should not affect your impartiality" and explained that "[i]f they [the prosecution] don't meet their burden, I'll instruct you to enter a not guilty." (Tr.1/16-17). The court then asked again: "Do you think you can be impartial?" (Tr.1/17). The juror responded, "I'll do my best." (Id.). The court did not excuse this juror, and Mr. Cicilline did not object. (Id.).

In response to the court's asking if he could be impartial, a second potential juror, panel 1, seat 6, who was a lieutenant with the Fall River Fire Department, responded as follows: "Well I'm not certain that I can. I'm involved in a litigation, a civil litigation as a defendant that's been going on since 1987 and is still pending. I think that may tend to skew my view of the system to be honest with you, your Honor." (Tr.1/19). The court did not follow up with further questions and did not excuse this potential juror. Again, Mr. Cicilline did not object. (Id.).

This second potential juror was seated on the petit jury, (Tr.1/22), and he was one of the deliberating jurors who returned a verdict in the case. (Tr.3/87).

---

[1] The trial transcripts are cited by volume and page number as "(Tr. / .)" A copy of the transcripts is available at the Court's request.

3

## C. After Mr. Cicilline pursued two conflicting theories of defense at trial and allowed damaging hearsay statements of the defendant's sister to go before the jury, the defendant was found guilty of possession of a class A substance with the intent to distribute.

During his brief opening statement, Mr. Cicilline introduced a single theory of defense—that Mr. Melo "did not exercise dominion and control over the substance." (Tr.1/19). He did not, at any point, say that the case involved an issue of misidentification. (See Tr.1/18-19). Instead, he concluded his opening statement by asserting that the case was about whether the prosecution could prove possession and by promising that he would argue this point in his closing: "[A]t the close of the evidence, I will certainly argue to you there is not enough evidence to establish that Mr. John Melo exercised any dominion and control over those drugs.

At trial, as anticipated, the primary factual issue in dispute was whether the identification of the defendant as the perpetrator was accurate. The prosecution presented the testimony of Roger Manny, a state police trooper. He testified that, on the evening of September 7, 1995, he "was running radar from a stationary post" on Route 195. (Tr.2/20-21). While running the radar, he observed a car traveling at 67 miles per hour in a zone with a speed limit of 55 miles per hour. (Tr.2/21). He tried to pull the car over. (Tr.2/22). Although the car, in which two men were riding, slowed down, it did not immediately stop. (Tr.2/22,24). Instead, it took an exit off the highway, pulled into a parking lot, and came to a stop. (Tr.2/25). After the car stopped, the driver got out of the car, looked toward the officer, took off his sunglasses, and threw the glasses on the

4

ground. (Tr.2/26). He then "kind of looked back, and then he ran into the woods." (Id.). The trooper "didn't chase after him . . . [b]ecause there was another passenger in the car." (Tr.2/27). Trooper Manny described the driver as "over 200 pounds, about 5'8", 5'9", with a stocky build, big neck" and made an in-court identification of Mr. Melo as the person who ran from the car. (Tr.2/29-29). He did not, however, include any of the information about the suspect's weight, height, and stature in the police report he filled out the night of the incident when the events described were fresh in his mind. (Tr.2/52,54-55).

The trooper placed the second man, whom he identified as Neal Stewart, in his cruiser and ran a warrant check. (Tr.2/29-30). After determining that Mr. Stewart had a warrant, he placed him under arrest and conducted an inventory search of the car. (Tr.2/30-31). He found five bags of heroin under the driver's seat and one packet of heroin under the passenger's seat. (Tr.2/31-32). He also found a "drug ledger" on Mr. Stewart's person. (Tr.2/61).

After determining that the car was registered to Kimberly A. Melo, Trooper Manny went to Ms. Melo's parents' house at approximately 4:00 a.m. (Tr.2/43-44). He spoke with Ms. Melo's parents but did not locate her. (Tr.2/44). Her parents showed him a family photo, and he stated that he recognized John Melo in the photograph. (Tr.2/45). He was unable to recall, however, if Mr. Melo had facial hair in the photograph or how many other people appeared in the photo. (Tr.2/59-60).

5

The prosecution also called Kimberly Melo, the defendant's sister, to the stand for the purpose of impeaching her with very damaging hearsay statements that otherwise would not have been admissible. She testified that the defendant was her brother and that, on September 7, 1995, she owned a blue Chevrolet with registration number 258YFF. (Tr.3/5). She also testified that, on the evening of September 7, 1995, a friend named Eric Fontaine dropped her off at work and then borrowed her car. (Tr.3/6). Because Mr. Fontaine did not own a car himself, he occasionally borrowed Ms. Melo's car, "and this was no different than any other time." (Id.). She learned that her car was in the custody of the state police from her boyfriend, who informed her that the police told him drugs had been found in her car and that the police "wanted to put a warrant out for [her] arrest." (Tr.3/8). Within two days of September 7, Mr. Fontaine called her and said that her car was at the police station. (Tr.3/8). Because she was afraid she would be arrested, Ms. Melo waited a week before she contacted the police about her car. (Tr.3/10). When she did call, she spoke with Trooper Daniel Bigelow, who told her that the call was being recorded, that they were not interested in arresting her, and that she could come pick her car up at any time. (Tr.3/11). She testified that she did not tell him that her brother had been driving the car on the evening of September 7. (Tr.3/11).

Trooper Bigelow was called to the stand for the sole purpose of testifying about hearsay statements allegedly made by Ms. Melo during a phone conversation. He testified that, when he answered a call from Ms. Melo on September 8, she told him she

6

was looking for her car. (Tr.3/14). He stated that, after he was unable to locate the car, she told him, "'[i]t may be under my brother John Melo's name. He was driving it." (Id.). He testified that he did not believe that the call had been recorded and that he had not filed a report about the phone call. (Tr.3/16). Mr. Cicilline did not object to the introduction of this testimony regarding the statements Ms. Melo allegedly made to Trooper Bigelow on September 8, and the court did not instruct the jury that the testimony was to be considered for impeachment purposes only.

In his closing argument, Mr. Cicilline changed his approach and argued that Mr. Melo was not in the car on the evening of September 7, 1995, and that Trooper Manny misidentified him as the man who ran from the car. (E.g. Tr.3/29,31). He also, however, made the alternative and inconsistent argument that Mr. Melo did not have dominion and control over the drugs: "It makes no sense that it was John Melo, but let's say you believe that. Then the next question is what evidence has the Commonwealth presented to you through that stand to establish beyond a reasonable doubt that he exercised possession." (Tr.3/35).

In the Commonwealth's closing, the prosecutor asserted that "Mr. Cicilline wants to take the approach in this case of having it both ways. He wants to say to you my client wasn't in the car that night, but ladies and gentlemen of the jury, if you think he was, guess what, he didn't know those drugs were under the front seat where he was sitting." (Tr.3/41).

7

The jury found Mr. Melo guilty of possession of a class A substance with the intent to distribute. (Tr.3/91). The court sentenced him to three and one half to five years in the state prison. (Tr.4/11).

## II.   Legal Argument

### A. Because the defendant's trial attorney was not authorized to practice law in Massachusetts and did not file a *pro hoc vice* motion, the defendant was denied his state and federal constitutional right to counsel and should, therefore, be given a new trial.

John M. Cicilline is the only attorney who filed a notice of appearance on behalf of the defendant in this case. See Exhibit 2. The docket sheet and the court file indicate that Mr. Cicilline never moved to be admitted *pro hoc vice*. Mr. Cicilline alone represented the defendant at trial. After trial, Randy Olen filed a Motion to Interrupt and Stay Execution of Sentence, and the last page of the case's docket sheet lists Mr. Olen as the defendant's attorney. There is also no indication that Mr. Olen ever moved to be admitted *pro hoc vice*. According to the Board of Bar Overseers of the Massachusetts Supreme Judicial Court, neither John Cicillene nor Randy Olen is authorized to practice law in the Commonwealth of Massachusetts. See Exhibit 4. No attorney authorized to practice law in Massachusetts served as local counsel for the case.

Under Massachusetts law, "[n]o individual, other than a member in good standing, of the bar of this commonwealth shall practice law, or by word, sign, letter, advertisement or otherwise, hold himself out as authorized, entitled, competent, qualified or able to practice law." G.L. c. 221, § 46A. If an out-of-state attorney wishes to appear

8

for a particular case, he or she must first obtain "permission of the court." Id. As the Supreme Judicial Court observed in DiLuzio v. United Elec. Workers of America, 391 Mass. 211 (1984), a "[p]arsing" of G.L. c. 221, § 46A, reveals that the statute's "operation turns on the fulfilment of its initial condition, 'permission of the court.'" The "permission of the judicial department is not merely important but is essential to the right to appear as an attorney under G.L. c. 221, § 46A." Id.

Because Mr. Melo was not represented by an attorney authorized to practice law in Massachusetts, he was denied his right to the assistance of counsel under the Sixth Amendment to the United States Constitution and Article 12 of the Massachusetts Declaration of Rights. While criminal defendants claiming that they received ineffective assistance of counsel must generally establish that counsel's deficiencies caused prejudice to the defense, "[a]ctual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice." Strickland v. Washington, 466 U.S. 668, 692 (1984). At the very least, the right to counsel entitles Massachusetts defendants to representation by a person legally authorized to practice law in Massachusetts.

In concluding that prejudice should be presumed when a defendant was represented by someone not authorized to practice law, one federal appellate court noted that the problem "is not simply one of competence." Solina v. United States, 709 F.2d 160, 164 (2nd Cir. 1983) (Friendly, J.). Instead, it also creates a kind of conflict of interest: "Such a person cannot be wholly free from fear of what might happen if vigorous

9

defense should lead the prosecutor or the trial judge to inquire into his background and discover his lack of credentials." Id. These concerns are only amplified by counsel's financial interest in continuing with the representation. When, as here, a defendant was represented by a person who is not an attorney under Massachusetts law, he has been denied the assistance of counsel altogether, and prejudice must be presumed.

This case presents an entirely different issue than the one presented in Commonwealth v. Thomas, 399 Mass. 165, 168 (1987). There, the Supreme Judicial Court refused to presume prejudice stemming from representation by an attorney who had been suspended for failing to re-register with the Board of Bar Overseers. Id. Central to the Court's holding was the fact that "the defendant's counsel had properly been admitted to the bar." Id. As the Court noted, the attorney's "suspension was for an administrative matter, and not for a matter raising serious questions such as moral character or other conduct bearing on his capacity and competence." Id. Unlike the attorney in Thomas, Mr. Cicilline had **never** been admitted to the Massachusetts bar and, thus, had never met the substantive requirements to practice law in this state, and the court never determined whether Mr. Cicilline was familiar with Massachusetts substantive and procedural criminal law. To whatever extent Randy Olen represented Mr. Melo in this case—and clearly that did not involve representation at trial—his lack of authorization to practice law in Massachusetts placed him in the same ethical and legal situation as Mr. Cicilline. Under these circumstance, prejudice must be presumed.

10

Mr. Melo was represented in this case by someone who was not authorized to practice law in the Commonwealth of Massachusetts. He was, therefore, not simply denied the right to **effective** assistance of counsel but, rather, was denied his right to the assistance of counsel altogether. Accordingly, the Sixth Amendment to the United States Constitution and Article 12 of the Massachusetts Declaration of Rights require that his conviction be vacated and that he be granted a new trial.

## B. Even if prejudice is not presumed, Mr. Cicilline's substandard performance did prejudice the defendant.

Even if this Court were not to presume prejudice, Mr. Cicilline, unschooled in the particularities of Massachusetts procedural and substantive criminal law, did commit serious errors over the course of trial, and these errors prejudiced Mr. Melo. In examining a claim of ineffective assistance of counsel, Massachusetts courts must engage in a two-part test, asking: (1) Was there a "serious incompetency, inefficiency, or inattention of counsel, ... falling measurably below that which might be expected form an ordinarly fallible lawyer," and (2) Did this substandard performance "deprive[] the defendant of an otherwise available, substantial ground of defense." Commonwealth v. Saferian, 366 Mass. 89, 96 (1974) (citations omitted). As explained in more detail below, Mr. Cicilline's performance fell measurably below what would be expected from an ordinarily fallible Massachusetts lawyer in three ways: (1) he failed to object to the Commonwealth's calling Kimberly Melo as a witness for the purpose of impeaching her

11

through the introduction of very damaging hearsay statements she allegedly made to

Trooper Daniel Bigelow; (2) he failed to object to the court's not excusing potential jurors

who stated that they might not be able to judge the case impartially; and (3) he presented

two contradictory and irreconcilable defense theories to the jury. These failures on Mr.

Cicilline's part caused incalculable prejudice to Mr. Melo.

## 1. Mr. Melo was seriously prejudiced by Mr. Cicilline's failure to object to the Commonwealth's introduction of hearsay statements allegedly made by Kimberly Melo.

At the end of the first day of testimony, the following exchange took place at

sidebar regarding the Commonwealth's intention to call Kimberly Melo as a witness the

next day:

> THE COURT: What is she [Ms. Melo] going to testify to? It's her car?

> MR. MURPHY: That it's her car and that the defendant is her brother, yes.

> THE COURT: They already know that.

> MR. MURPHY: Well, through second and third-hand sources, yes, judge. They may not find that too reliable.

(Tr.2/83). The prosecutor did not say that he was going to ask her about any telephone

conversation, or conversations, with Trooper Bigelow. (See Tr.2/83-84.)    When Ms.

Melo did testify the next day, the assistant district attorney only asked five questions

about her ownership of the car and the fact that Mr. Melo is her brother. With the

12

exception of general background questions, the rest of the Commonwealth's questions concerned conversations Ms. Melo had or was alleged to have had with Trooper Bigelow and whether her brother had been in possession of her car on the evening of the drug seizure. (See Tr.3/4-11). During her testimony, she stated that, because of fear of being arrested, she waited one week before calling the state police to recover her car and that when she did call she did not say that Mr. Melo had used her car on the evening of September 7, 1995. (Tr.3/10-11). Instead, she testified, her friend Eric Fontaine borrowed her car that evening. (Tr.3/6).

The next witness called by the prosecution was Trooper Daniel Bigelow, who testified that he answered a phone call at the state police barracks from Ms. Melo on September 8, 1995, the day after the seizure of the drugs. (Tr.3/13). According to Trooper Bigelow, Ms. Melo asked if he "knew where her car was." (Tr.3/14). The trooper looked in the appropriate logs but was unable to find a car under her name. (Id.). He testified that when he informed Ms. Melo of this fact, she responded, "'It may be under my brother John Melo's name. He was driving it.'" (Id.). Trooper Bigelow did not testify about any subject other than this telephone conversation. Mr. Cicilline did not object to any portion of Ms. Melo's or Trooper Bigelow's testimony or request that the court instruct the jury that it was to consider Trooper Bigelow's testimony only for impeachment purposes. And the court did not give an instruction, whether after Trooper Bigelow's testimony or during final instructions, regarding the distinction between

13

impeachment and substantive evidence.

In Commonwealth v. Benoit, 32 Mass.App.Ct. 111, 113 (1992), the prosecution called the defendant's brother as a witness and elicited testimony that he and the defendant had never had a conversation about the crime the defendant was alleged to have committed. The Commonwealth then called another witness, who testified that the brother told him that the defendant admitted that he had committed the crime. Id. at 113-114. The trial court instructed the jury that it was not to consider the second witness's testimony as substantive evidence. Id. On appeal, the Commonwealth argued that the testimony was admissible under G.L. c. 233, § 23.[2] Id. at 114. The Appeals Court rejected this argument, holding, instead, that the prosecution cannot "'call a witness that it knew would not give it useful evidence, just so it could introduce hearsay evidence in the hope that the jury would miss the subtle distinction between impeachment and substantive evidence—or if it didn't miss it, would ignore it. The purpose would not be to impeach

---

[2] This statute reads as follows:

> The party who produces a witness shall not impeach his credit by evidence of bad character, but may contradict him by other evidence, and may also prove that he has made at other times statements inconsistent with his present testimony; but before proof of such inconsistent statements is given, the circumstances thereof sufficient to designate the particular occasion shall be mentioned to the witness, and he shall be asked if he has made such statements, and, if so, shall be allowed to explain them.

14

the witness but to put in hearsay as substantive evidence against the defendant . . .'" Id. at

115-116, quoting United States v. Webster, 734 F.2d 1191, 1192 (7th Cir. 1984) (Posner,

J.). See also Commonwealth v. McAffee, 430 Mass. 483, 490 (1999) (endorsing the

"Benoit rule").

     Here, the introduction of Kimberly Melo's testimony and the hearsay statements

she allegedly made to Trooper Bigelow violated the Benoit rule. The prosecutor's stated

purpose for calling Ms. Melo to the witness stand—to verify that she was the owner of the

car and John Melo's sister—was clearly a pretext. Only five of the questions the

prosecution asked of Ms. Melo related in any way to her ownership of the car or her

relationship to Mr. Melo. The rest of examination, which covers six transcript pages,

focused on who had possession of the car on September 7 and the timing and content of

Ms. Melo's phone conversation with Trooper Bigelow. All of the prosecution's questions

relating to these subjects led to answers that were detrimental to the Commonwealth's

case. But they did set up testimony that could then be impeached through the

introduction of the hearsay statements Ms. Melo allegedly made to Trooper Bigelow.

This is precisely what Benoit forbids. Mr. Cicilline's failure to object to the introduction

of Trooper Bigelow's testimony was a serious error that allowed highly prejudicial

inadmissible evidence to go before the jury. A Massachusetts criminal lawyer familiar

with the basics of Massachusetts evidentiary law would have been acquainted with the

rule set forth in Benoit and would have objected to the introduction of Ms. Melo's

15

hearsay statements.

Without this hearsay statement, the only evidence before the jury pointing to Mr. Melo as the driver of the car would have been the identification made by Trooper Manny. This identification was problematic in several respects. The trooper only saw the person who fled from the car for a matter of seconds, and the two men were far enough away from each other that the trooper was unable to apprehend the suspect. In addition, Trooper Manny went to the defendant's parents' home solely because the car was registered to the defendant's sister, and then made an initial identification of Mr. Melo from a family photo. Because the trooper was at the house for the purpose of identifying the suspect who had fled, this identification was clearly suggestive. Finally, although Trooper Manny provided a detailed description of the defendant in court when the defendant was seated before him, he failed to include any of these details in the police report he filled out and filed on the night of the incident. Because there were serious problems with the trooper's identification of the defendant as the person who fled from the car, the improper admission of Ms. Melo's hearsay statements and Mr. Cicilline's failure to object caused great prejudice to the defendant. The defendant's conviction should, therefore, be vacated.

16

## 2. Mr. Cicilline's failure to object to the court's not excusing jurors who failed to state that they could be impartial caused serious prejudice to the defendant.

During jury selection, two prospective jurors failed to state unequivocally that they would be impartial and were, nonetheless, not excused by the court. In both instances, Mr. Cicilline did not ask the court to follow up with additional questions, and he did not object when the court failed to excuse the jurors. The first juror, who had been married to "an ex-detective on the narcotics squad," stated that she did not feel she could be impartial for this reason. (Tr.1/17). After trying to rehabilitate her, the court again asked if she could be impartial, and she responded, "I'll do my best." (Tr.1/17). The second juror, when asked if he could be impartial, stated, "Well I'm not certain that I can. I'm involved in a litigation, a civil litigation as a defendant that's been going on since 1987 and is still pending. I think that may tend to skew my view of the system to be honest with you, your Honor." (Tr.1/19). The second juror was seated on the petit jury and was one of the jurors who deliberated and returned a verdict in the case. Because Massachusetts law requires courts to excuse potential jurors who do not state unequivocally that they would be impartial, Mr. Cicilline's failure to object under these circumstances was a very important mistake that caused the defendant serious prejudice by allowing him to be tried before a potentially biased jury.

In Commonwealth v. Long, 419 Mass. 798, 803 (1995), which was decided a year and a half before Mr. Melo's trial, a potential juror told the court that "'[i]n fairness to

17

the defendant [who was Cambodian] I was opposed to the war in Vietnam and I was opposed to the Khmer Rouge.'" In an attempt to rehabilitate the juror, the court asked if he could be fair to the defendant, and the juror responded, "'The only way I can answer that, your honor, is that I would really hope that I could be.'" Id. at 804. The court did not excuse this juror, and he later deliberated on the verdicts. Id. at 801. The Supreme Judicial Court reversed the defendant's conviction, holding that the fact that the juror "never unequivocally stated that he could be impartial . . . [or] that he could put aside his bias against the Cambodian defendant . . . indicated that he might not be able to set aside his impressions of Cambodians and render verdicts based on the evidence presented in court." Id. at 804. In so holding, the Court acknowledged that "[a] trial court is in a better position than an appellate court to ascertain . . . whether the juror is actually biased, or is merely trying to convince the judge to excuse him or her from serving," but concluded "that it is better to risk being overly cautious and excuse jurors with asserted biases that may be fabricated, than to insist that a particular juror sit despite his statements that his biases may influence his abilities to decide the case fairly and impartially." Id. at 805, n. 7. See also Commonwealth v. Somers, 44 Mass.App.Ct. 920, 922 (1998) (reversing defendant's conviction where a potential juror, who was not excused but also did not later deliberate, "could not unequivocally state that he would be impartial").

Here, the court's failure to excuse the jurors was in direct conflict with Long. The

18

first potential juror used very similar language to the Long juror's "I would really hope that I could be [impartial]," stating "I'll do my best." This was not an unequivocal statement by the juror that she could be impartial, and it was made even more problematic by the fact that the juror initially stated that she did not think she could be impartial. Under Long, the court was obliged to excuse this potential juror, and Mr. Cicilline clearly should have objected when the court failed to do so. The second juror's statement was even more problematic under Long. This juror did not even pledge to do his best as the juror in Long did. Instead, he stated that he was "not certain" that he could be impartial. When Mr. Cicilline failed to object to the court's not excusing this juror, his performance fell "measurably below that which might be expected form an ordinarily fallible lawyer." See Saferian, 366 Mass. at 96.

Having the second juror deliberate on the verdict despite his failure to state that he would be impartial cased great prejudice to the defendant. As the Long Court noted, "The presence of even one juror who is not impartial violates a defendant's right to trial by an impartial jury." Long, 419 Mass. at 802. "[B]ecause the impartiality of the adjudicator goes to the very integrity of the legal system," courts have repeatedly held that harmless error analysis should not apply and that, instead, prejudice should be presumed. E.g. Gray v. Mississippi, 481 U.S. 648, 668 (1987); Commonwealth v. Auguste 414 Mass. 51, 57 (1992). Likewise, where defense counsel's ineffective performance leads to a potentially biased juror sitting on the defendant's jury, as is the

19

case here, the defendant will always have suffered prejudice since he will have been deprived a fair trial before an impartial jury.

Even though the first juror did not deliberate on the verdict, Mr. Cicilline's failure to object to her not being excused likely caused prejudice to the defendant. A defendant's rights are violated when he is forced to use his final peremptory challenge on a juror who should have been excused for cause and then must accept a juror he otherwise would have challenged peremptorily. Somers, 44 Mass.App.Ct. at 922. Here, the peremptory challenges were not made on the record, see Tr.1/21-27, so it is impossible to tell if the defendant was forced to accept a juror he otherwise would have challenged peremptorily. With the record in this state and with such important rights at issue, the court should assume that he was forced to use his final peremptory challenge, and Mr. Cicilline's failure to object should be presumed to have prejudiced Mr. Melo. See Auguste, 414 Mass. at 58 ("[T]he erroneous denial of the right to exercise a proper peremptory challenge is reversible error without a showing of prejudice.").

Because Mr. Cicilline failed to object to the court's not excusing potential jurors who did not state unequivocally that they would be impartial and this failure caused prejudice to the defendant, the defendant's conviction must be vacated and he must be given a new trial.

### 3. Mr. Cicilline's pursuit of two contradictory and irreconcilable defense theories caused prejudice to the defendant.

In his opening statement, Mr. Cicilline never mentioned that this case involved

20

misidentification, and he never said that he would raise this defense during the trial. Instead, he said that "really what this case is all about" is whether the defendant had drugs in his possession and promised that "at the close of evidence, I will certainly argue to you there is not enough evidence to establish that Mr. John Melo exercised any dominion and control over those drugs." (Tr.2/19). In his closing argument, Mr. Cicciline did not, however, begin by making this promised argument. Instead, he spent the first half of his closing arguing that Trooper Manny misidentified the man who ran from the car. (E.g. Tr.3/29,31). About halfway through the closing, he turned to the argument he had promised to make in his opening, even though it was in direct conflict with his misidentification defense: "It makes no sense that it was John Melo, but let's say you believe that. Then the next question is what evidence has the Commonwealth presented to you through that stand to establish beyond a reasonable doubt that he exercised possession." (Tr.3/35). The contradiction between these two arguments was not lost on the prosecutor, who pointed out that "Mr. Cicilline wants to take the approach in this case of having it both ways. He wants to say to you my client wasn't in the car that night, but ladies and gentlemen of the jury, if you think he was, guess what, he didn't know those drugs were under the front seat where he was sitting." (Tr.3/41). Making these conflicting arguments—especially after allowing Ms. Melo's hearsay to go before the jury—was a serious error on Mr. Cicilline's part that caused great prejudice to the defendant.

21

By presenting these two irreconcilable defense theories to the jury and seeming to switch theories in the middle of trial, Mr. Cicilline prevented Mr. Melo from having any meaningful defense considered by the jury since the two defenses undercut one another. See Commonwealth v. Westmoreland, 388 Mass. 269, 274-275 (1983) (conviction reversed on ineffective assistance of counsel grounds where counsel abandoned insanity defense in closing argument). While advancing either of these two defense theories alone would not have constituted an error, pursuing both theories raised the inescapable inference that, in the prosecutor's words, "Mr. Cicilline wants to take the approach in this case of having it both ways." This error was compounded by Mr. Cicilline's failure to object to the introduction of Ms. Melo's hearsay statement since that statement, which was admitted without any limiting instruction, undercut the misidentification defense.

Mr. Cicilline's presenting two irreconcilable defenses to the jury was a serious error that prejudiced the defendant by preventing him from having any single meaningful defense considered by the jury. Accordingly, this Court should vacate the defendant's conviction and grant him a new trial.

## C. The court's jury instructions regarding identification presumed that the defendant was the perpetrator and thereby created a substantial risk of miscarriage of justice.

In its jury instruction on identification, the court began by correctly employing language regarding the Commonwealth's burden of proof from the model instruction. (Tr.3/68). The judge went on, however, to deviate from the model instruction and to use

22

language that presumed that the defendant was the driver of the car:

> In general, a witness bases their identification that they make on
> their perception through the use of senses. Usually the witness'
> sight, but this in not necessarily so, and you may use other senses.
> **Are you the jury satisfied that the identification made by the
> witness in this case, the trooper who first stopped the defendant,
> was the product of his own recollection?** You may take into
> account both the strength of that identification at the time it was
> made and the circumstances under which the identification was
> made.

(Tr.3/70) (emphasis added). In the model instruction, the sentence highlighted above

reads, "The second thing to consider is whether you are satisfied that the identification

made by the witness subsequent to the offense was the product of his or her own

recollection." Despite the problem with this deviation from the language of the model

instruction, Mr. Cicilline failed to raise an objection.

In Commonwealth v. Fitzpatrick, 18 Mass.App.Ct. 106, 109, 111( 1984), the court

instructed judges in future cases to alter the so-called Rodriguez instruction to omit the

word "next" from the instruction's explanation that the jury can "'consider the length of

time that lapsed between the occurrence of the crime and the **next** opportunity of the

witness to see the defendant, as a factor bearing on the reliability of the identification."

The problem with the inclusion of the word "next" was that it might "lead some jurors to

draw an unfair inference" that the defendant was necessarily the perpetrator of the crime.

Id. at 111. While the Supreme Judicial Court did later rule that the use of the language

criticized in Fitzpatrick does "not alone create a substantial risk of miscarriage of justice,"

23

Commonwealth v. Hallet, 427 Mass. 552, 558 (1998) (citation omitted), the language used by the court here was much more problematic and, in the context of the entire case, did create a substantial risk of miscarriage of justice.

The language used in this case caused greater harm than a standard Fitzpatrick error for several reasons. First, while in Fitzpatrick the language employed could have possible negative inferences, here the language explicitly stated that the trooper "stopped the defendant." The jury did not need to make any inferences to arrive at an unfair conclusion about the defendant. Instead, the court's language could only be interpreted to lead to one inevitable conclusion—that the driver of the car and the defendant were the same person. Second, the admission of Ms. Melo's hearsay statements in violation of Benoit, particularly without an instruction that they were to be considered only for impeachment purposes, combined with this erroneous instruction to cause even greater harm to the defendant. As discussed above, Trooper Manny's identification of the defendant was problematic in several respects, and the unobjected to admission of Ms. Melo's hearsay statements placing the defendant in the car undercut the defendant's argument that he was misidentified as the fleeing driver. The language used in the instruction only added to the prejudice, constituting, as it did, an affirmative statement by the court that the defendant was, in fact, the driver of the car. Finally, the issue of identification was clearly a live issue at trial—one that was raised and argued during the defendant's closing argument.

In the context of this case, the language used by the court during its identification instruction created a substantial risk of miscarriage of justice in violation of the defendant's due process rights under the state and federal constitutions. This Court should, therefore, vacate the defendant's conviction and order a new trial.

III.    **Conclusion**

For the reasons stated above, the defendant's conviction should be vacated and a new trial should be ordered.

JOHN MELO
By his attorney[3],


Paul Kitchen
Law Offices Of Paul B. Kitchen
B.B.O. NO.
210 Rock Street
Fall River, MA 02720
508-673-8100

Dated: July ___, 2004

---

[3] Attorney Ryan M. Schiff, Salsberg & Schneider, assisted in drafting this memorandum.

25